UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SANDRA PEELER,

Plaintiff,

v.

THE BOEING COMPANY, *et al.*,

Defendants.

No. C14-0552RSL

MEMORANDUM OF DECISION

This matter was heard by the Court in a six-day bench trial commencing on January 11, 2016, and concluding on January 20, 2016. Plaintiff Sandra Peeler brought this action against The Boeing Company and a physician at Boeing Medical, Dr. Daniel Gonzalez-Dilan. Plaintiff alleges that she was subjected to a hostile work environment, that defendants failed to accommodate her disability, and that they discriminated against her because of her disability in violation of the Washington Law Against Discrimination, RCW Chapter 49.60.[1]

**FINDINGS OF FACT**

By a preponderance of the evidence, the Court finds as follows:

Boeing hired plaintiff as an aviation maintenance technician at its Everett, Washington, facility on January 4, 2013. She was assigned to a new-hire training program that was to last three months. Plaintiff was the only woman and one of the least experienced aircraft mechanics

[1] Plaintiff's retaliation claim was dismissed before trial. Dkt. # 117.

in the class. She was fairly quiet, sat in the front of the class, and rarely socialized between presentations and assignments. As the other trainees became more comfortable with each other, they chatted and argued about various non-work topics. Cursing was fairly commonplace, and the volume in the classroom could be quite loud. A fellow classmate moved to the front of the class with plaintiff: he, like plaintiff, found the chatter distracting and wanted to focus on the materials.

Plaintiff's perception of the work environment was significantly different than that of the other trainees and instructors. Almost all of her classmates and instructors reported a professional working environment during class with lots of good-natured profanity and joking around (occasionally of a juvenile or decidedly lowbrow variety) during breaks. While there were complaints about wives or girlfriends, no one recalled any disparaging remarks about women in general or any gender-based comments addressed to plaintiff in particular. Plaintiff, however, recalled intentionally harassing conduct aimed at her, constant gender-based jokes and comments, and an overall atmosphere that belittled women in the workplace. Most of the events and comments about which plaintiff complains have been proven:

- Alex Perme said something like "I got your donuts right here" with a gesture toward his pants;[2]
- classmates argued about the impact of Rosie the Riveter on the industry's present-day perception of airplane mechanics and the quality of American beer;
- some classmates were impatient when it took plaintiff more time to complete assignments than the rest of the class;
- a classmate remarked that some A&P (Airframe and Powerplant) licenses were nothing

[2] While the Court has no problem believing that Mr. Perme was loud and at times inappropriate in the workplace, the idea of his performing a pantomimed sex act with another man seemed to genuinely horrify him. There is no corroborating evidence that such an event took place, and plaintiff has not shown by a preponderance of the evidence that it occurred.

but paper;

- a classmate was involved in a custody battle and said unkind things about his wife;
- the instructors and trainees used the phrases "2 ball," "4 ball," and "6 ball" to refer to electrical parts that had numbers beginning with 00 or 0000 or 000000;
- Harold Hair questioned the sexual orientation of a man in a video who was carrying a fanny pack;
- an instructor, Thomas Poppie, told a story regarding a female trainee who did not know the proper name for a torque wrench; and
- a supervisor, Clint Slocum, recounted an episode in which an African-American employee took offense at the phrase "good morning sunshine."[3]

The parties' characterization of these events and their impact on the working environment are hotly contested. The Court finds that, although these interactions may have been loud, obnoxious, juvenile, and/or inappropriate in various ways,[4] they do not reflect gender-based hostility toward women in general or plaintiff in particular. None of the gender-based comments or discussions was aimed at plaintiff, plaintiff is not immune from criticism or entitled to special consideration simply because she is a woman, and the boorish jokes and word play were not pervasive or severe. A reasonable woman in plaintiff's place would not have perceived any alteration in the terms and conditions of her employment with Boeing.[5]

---

[3] This list is not exhaustive. The Court has considered all of the events and comments discussed at trial.

[4] Perme and Hair both received counseling and discipline for their comments, not because they constituted gender-based harassment, but because they were inconsistent with Boeing's standards for behavior. Poppie was advised not to mention the gender of the person who identified a torque wrench as a "wrench, torque" when telling the story in the future.

[5] The Court finds that plaintiff's threshold for what she considers "hostility" in general and "gender-based hostility" in particular is unreasonably low. Walter Ozmore reported having a discussion during which something negative was said about Alabama. Plaintiff, who is from Georgia, took offense, much to Ozmore's surprise. Plaintiff was aggravated by the volume of Kim Robinson's voice at one

Contrary to plaintiff's argument at trial, her unique perception of the reality of her situation cannot be explained by the fact that she is a woman. First, other classmates were also sensitive to the profanity and tomfoolery in the workplace. They, however, recognized that it was not aimed at anyone and treated it as unwelcome background noise to the training program. Second, plaintiff objected to anecdotes that had long been used in the training program to

---

point, despite the fact that he was wearing headphones at the time. When classmates got into an argument about the use of English in the workplace, plaintiff perceived a threat to herself and began evaluating whether she needed to vacate the area. A co-worker's use of "bitch" to describe his ex-wife, with whom he was in a custody battle, was deemed an attack on women. The use of the f-word or loud voices in the workplace, even though not aimed at her, was deemed harassing.

At some point, plaintiff complained to Supervisor Slocum about vulgarity and swearing in the workplace. After discussing the matter, they decided that plaintiff would let people know that she was offended by the profanity and that Slocum would send a skill adviser to each training group to give a "be professional" speech and make clear Boeing's behavioral expectations. The evidence shows that Richard McKennon spoke to plaintiff's group from the front of the class, had the group's attention (with the possible exception of Clarence Santiago), and emphasized that Boeing employees are to use appropriate language in the workplace, in part because they can never be sure when a customer is in the facility. Plaintiff's memory of McKennon's interaction with the class is very different: she testified that McKennon merely stuck his head into the classroom and that the trainees in the back of the room were not even aware that he had been there. Plaintiff, for her part, let her co-workers know that their behavior bothered her, stating "Hey guys, I'm a woman and I'm right here, please don't forget about me." In her view, the cursing and vulgarity should have stopped at that point: when the behaviors continued, they were attributed to gender-based hostility and intentional harassment regardless of whether they had any tie to gender or to plaintiff. This change in mindset greatly affected how plaintiff perceived her working environment, both in hindsight and going forward.

At the beginning of the training period, plaintiff was struck in the side as the class was filing into a room. She was initially willing to assume that it had been an accident, although she was surprised that none of the coworkers around her apologized at the time. Later, however, the event grew large in her mind as an example of gender-based hostility in the training program. She came to believe that her classmates were being loud, using profanity, and making "2 ball" references and donut jokes in order to harass her. She also concluded that co-workers who were unimpressed with her skills or experience were critical only because she was a woman. When an instructor told an anecdote to highlight that people come to Boeing from all sorts of backgrounds and with different types of experience, plaintiff objected because the story revealed that the ill-informed person was a woman. And when a supervisor attempted to make the point that behavior or statements that seem fine to one person may be offensive to others, he managed to offend plaintiff because the story involved an African-American woman. Both of these stories related real life events and had been told numerous times before. To the extent plaintiff believes that either Poppie or Slocum intended to denigrate women or that these anecdotes altered the terms and conditions of her employment, she is mistaken.

enhance awareness and sensitivity without comment or complaint from any other women. Finally, the only other woman to deal with plaintiff's class, a union steward and instructor, enjoyed working with the group and described the class as welcoming. She did not sense any disdain towards herself or hear any comments or jokes about women. This is in sharp contrast with plaintiff's memory of how the class interacted with the same instructor: plaintiff thought that her classmates failed to show the instructor any respect, were dismissive, and made snide comments when they learned she had recently had a baby.

On March 13, 2013, plaintiff went to the Providence Regional Medical Center in Everett because she was experiencing high levels of anxiety and knew she needed external support. Plaintiff suffers from Post-Traumatic Stress Disorder ("PTSD"), which can be triggered by profanity, confrontation, stress, or sexual violence. Not all of her triggers are known or can be anticipated. When triggered, her symptoms include debilitating anxiety and dissociative episodes. In early 2013, plaintiff found herself overwhelmed by the behaviors described above and unable to ground herself. As she had done in the past, she turned to a hospital when her coping skills were insufficient to hold back her symptoms. Seeking stabilization and additional coping skills, she entered Fairfax Behavioral Health psychiatric hospital for in-patient treatment.

On April 3rd, plaintiff initiated the return to work process at Boeing. She went to Boeing Medical, requested permission to return to work, and reported that she suffers from PTSD and had recently been hospitalized at Fairfax for suicidal and homicidal ideation. The intake nurse noted that plaintiff's therapist had cleared her to return to work and that plaintiff had presented a request for non-specific accommodations to avoid ill-defined triggers. Boeing Medical declined to clear plaintiff for work based on recent events and the severity of her symptoms and made a referral to the Employee Assistance Program ("EAP") for evaluation. Plaintiff agreed to the referral. EAP contacted plaintiff's treating psychiatrist, Dr. Megan Gary, to get additional information regarding specific disabilities that required accommodation and a statement in writing that plaintiff was cleared to return to work.

Dr. Gary sent a letter to Boeing indicating that plaintiff was medically cleared to return to work as of April 18th. EAP began to process plaintiff's return to work and scheduled a meeting for April 22nd: plaintiff was to pick up a temporary badge, then go to EAP and Boeing Medical to get necessary approvals. When plaintiff arrived that morning, however, she was distraught and told the EAP social worker, Anne Markiewicz, that the thought of having to go back to work was making her nauseous. Markiewicz noted that plaintiff was distressed, clenching her hands, and crying.[6] Markiewicz encouraged plaintiff to continue therapy at Group Health until she was ready to go back to work and left a message for Dr. Gary to let her know what had happened. Plaintiff also called Group Health and indicated that the meeting with EAP went well, but that they did not believe plaintiff was ready to return to work.

On May 10th, Group Health left a message saying plaintiff was ready to return to work. When EAP contacted the provider, however, it appeared that it was plaintiff who had determined that she was ready to return while the Group Health staff remained leery. Markiewicz called in a supervisor and Dr. Gonzalez to review plaintiff's case. They decided that Boeing should obtain an independent forensic evaluation of plaintiff to determine whether she could return to work. Plaintiff was amenable to this plan and signed the appropriate releases. A job analysis and medical records were forwarded to Dr. Tyson Bailey, a clinical psychologist. Dr. Bailey conducted a comprehensive cognitive and personality assessment of plaintiff over fifteen hours, split fairly evenly between interviews and testing. He concluded that, while plaintiff presented well and had a variety of coping skills, her skills were not particularly well-suited to the workplace. For example, avoidance as a coping strategy can be problematic if you have to come back to the same situation over and over again: temporarily absenting oneself from the

[6] Plaintiff's memory of this meeting was very different than Markiewicz'. Plaintiff offered no reason for the meeting on April 22nd, but apparently feared that she was about to be terminated because there was a problem with her accommodation paperwork. Plaintiff testified that Markiewicz rejected Dr. Gary's note, acted like a dictator, and made hurtful and disrespectful statements and that it was Markiewicz' conduct that triggered her distress.

classroom or workplace is not a means for figuring out how to deal with the underlying trigger. In addition, plaintiff seemed to have a lot of coping strategies from which to choose. The downside is that when she is facing a trigger, plaintiff then has to decide which coping strategy to use, increasing her stress level. Dr. Bailey believed that periodic hospital visits to restabilize were an ineffective long-term strategy. In his opinion, plaintiff needed to form and continue a relationship with a treatment provider so she can benefit from consistent therapy and develop a consistent coping strategy. In the absence of a stable therapeutic relationship, plaintiff's symptoms would continue to be triggered and she would likely continue to need hospitalization.

Dr. Bailey also concluded that plaintiff has a low threshold for feeling threatened, which is a not-unusual response to childhood trauma: an early trigger is an attempt to keep oneself safe. Given the way plaintiff described her work environment, Dr. Bailey was nonetheless surprised that the conduct and statements had such a profound impact on her. Plaintiff interpreted ambiguous statements and events in the worst possible light, perceiving threats and hostility where none existed. Dr. Bailey found the fact that plaintiff dissociated during a therapy session noteworthy in this regard: not only did it occur in what would generally be considered a safe environment, but it took two trained Group Health employees to bring her out of it. The episode suggests that plaintiff's explicit and implicit triggers are difficult to predict and raises concerns regarding the possibility and impact of a dissociative event on the manufacturing floor.

Dr. Bailey recommended that plaintiff undergo 6-12 months of Dialectical Behavior Therapy ("DBT") plus weekly therapy sessions to get the consistency and continuity of treatment that she was missing. The DBT curriculum lasts six months, but many patients go through it twice to ensure that they have learned and can utilize the coping mechanisms in difficult situations. Dr. Bailey also made dietary and reading recommendations. Lastly, he specified that, before plaintiff returned to work, she should have another complete psychological evaluation. He was concerned that plaintiff's clear and effective communication style in an interview, when she is not under emotional distress, would mask any defects in concentration,

memory, control, and organization that became apparent in the more ambiguous and intense environment of an evaluation.

EAP told plaintiff, Group Health, and Boeing Medical about the treatment recommendations, particularly the 6-12 months of DBT and the weekly therapy sessions. Markiewicz informed both Group Health and plaintiff that Group Health would have to submit paperwork to support an extension of plaintiff's leave of absence. Plaintiff requested a copy of Dr. Bailey's report, but Markiewicz refused on the ground that the report was Boeing's property. Nor would Markiewicz share a copy of the recommendations until a supervisor approved their release.[7] Plaintiff was immensely disappointed that she could not return to work and began to distrust the communications between Boeing and Group Health. She revoked and rescinded all previous authorizations for the sharing of information.

On June 26, 2013, plaintiff and her union representative met with Markiewicz and Dr. Gonzalez. Markiewicz urged plaintiff to sign another release so that Boeing could update Group Health on her status and Group Health could help plaintiff with her short-term disability and medical leave of absence paperwork. Plaintiff declared an intent to obtain another provider and resented Boeing's attempt to control or approve her choice. The meeting did not go well: plaintiff left the meeting without identifying a provider and with no way to substantiate her medical disability for leave of absence or insurance purposes.

By July 19th, plaintiff had returned to treatment with Group Health and signed a new release. Group Health confirmed that it had submitted paperwork to Aetna and notified EAP that plaintiff had participated in a day treatment program for mental health at Overlake Hospital. Plaintiff was, however, refusing to work with the Group Health nurse who is part of its DBT

[7] Dr. Gonzalez testified that if a patient requests a copy of an IME, there must be a release on file. The release is sent to the medical records office, which reviews the request and the information to determine whether the requested release would be harmful to the patient. When plaintiff asked for a copy of the report, she was told she had to submit a release form at the front desk. In the meantime, Dr. Gonzalez copied down the recommendations for plaintiff.

program. Markiewicz requested, and Group Health provided, monthly updates regarding plaintiff's treatment. Although plaintiff stated at trial that she simply wanted to work together with Boeing to develop a treatment plan if that's what the employer thought she needed, plaintiff inexplicably refused to participate in the treatment plan recommended by Dr. Bailey and sought by EAP.

In early September, Boeing received a note from plaintiff's Group Health providers stating "Sandra Peeler is showing stability in her mood, reporting absence of anxiety and depressive symptoms. Ms. Peeler is hereby released to return to work." Pl's Ex. 118. Plaintiff had a meeting with EAP to start the return to work process at which she argued that her week-long program at Overlake and two therapy sessions at Group Health were sufficient. Markiewicz contacted Dr. Gonzalez to determine whether he was willing to have plaintiff re-evaluated despite not having participated in 6-12 months of DBT and/or weekly therapy sessions. He was. Because existing release forms had expired, Boeing sent plaintiff new forms on September 9th and September 19th. Plaintiff signed both, but altered them to impose a condition. Boeing sent another form by certified mail on September 30th, instructing plaintiff not to "write anything extra on this form" and to return it by October 10th. Defs' Ex. 547. The form was not returned. Plaintiff had already left the State of Washington and returned to Georgia. A re-evaluation with Dr. Bailey was never scheduled. Plaintiff filed this lawsuit in April 2014.

## CONCLUSIONS OF LAW

### A. HOSTILE WORK ENVIRONMENT

Based on the foregoing facts, the Court concludes that the conduct and comments to which plaintiff was subjected in the workplace were not sufficiently severe or pervasive enough to alter the conditions of employment or to create an abusive working environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Dawson v. Entek Int'l, 630 F.3d 928, 937-38 (9th Cir. 2011). The fact that plaintiff subjectively perceived her working environment as hostile and threatening due to her traumatic history and PTSD is not enough: the question is whether a

reasonable woman in plaintiff's circumstances would perceive it as abusive. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Domiguez-Curry v. Nev. Transp. Dept., 424 F.3d 1027, 1034 (9th Cir. 2005). A reasonable woman would not, and plaintiff has failed to prove her hostile work environment claim.

**B. FAILURE TO ACCOMMODATE**

The Court concludes that, given the short period of time in which plaintiff worked at Boeing, her recent hospitalization, and the lack of clarity regarding triggering events, Boeing appropriately set out to determine whether plaintiff was capable of performing the essential functions of an aviation maintenance technician before considering whether accommodations were available. While plaintiff's efforts to seek a career in aviation and work through her disabilities are inspiring and honorable, Boeing's initial concerns regarding plaintiff's ability to manage the normal stresses of the workplace, interact appropriately with others, and deal with ambiguous, intense, or emotionally-charged circumstances were confirmed by an independent and comprehensive psychological evaluation. The examining doctor provided therapy recommendations designed to provide the kind of consistent treatment and support that plaintiff needed. Plaintiff reacted badly to the recommendations. Not only did she refuse to follow them, but she concluded that Group Health and Boeing were colluding with each other and severed relationships and communications that could have helped her successfully navigate the leave of absence and insurance issues she faced.

Boeing rightly concluded that plaintiff did not have the coping skills necessary to return to work as of June 2013. When plaintiff participated in additional treatment at Overlake Hospital, Boeing was willing to have her re-evaluated even though she had refused to follow Dr. Bailey's treatment recommendations. The re-evaluation was unfortunately stalled while Boeing sought permission to release information. One could argue that a release was not necessary or that plaintiff was within her rights to demand a copy of Dr. Bailey's report and her Boeing files, but her decision-making in this regard was an over-reaction and counterproductive. Ultimately,

the evidence shows that plaintiff failed to follow through on the evaluative process. The Court finds that Boeing reasonably excluded plaintiff from the workplace throughout this process, having every reason to believe that she did not have the coping skills to perform the essential functions of her job. Mayo v. PCC Structurals, Inc., 795 F.3d 941, 944 (9th Cir. 2015) ("An essential function of almost every job is the ability to appropriately handle stress and interact with others.").

Plaintiff argues that Boeing was bound to accept her treating physician's opinion that plaintiff was ready to return to work. This is not the law. Nor would such deference to the treating physician make sense in this case. Dr. Gary's first note clearing plaintiff to return to work was contradicted almost immediately by plaintiff herself, who said she was not ready to return to work. EAP confirmed that a later note was generated at plaintiff's instance: the Group Health staff was not, in fact, convinced that plaintiff could successfully return to work. With two false starts, Boeing decided to obtain an independent medical examination and thereafter gave greater weight to Dr. Bailey's report than to the brief notes generated by Group Health. This preference was entirely reasonable given that Dr. Bailey engaged in two days of intensive interviews and testing, reviewed plaintiff's medical records, and obtained a job analysis. The Group Health providers, on the other hand, had very limited interactions with plaintiff, provided no analysis, and did not consider the stresses and intensity of the workplace to which plaintiff would be returning. The Court finds that throwing plaintiff onto the facility floor in the environment described by Amanda Craig – with no clear idea of what might trigger plaintiff's debilitating anxiety or dissociative episodes – would have put her, and possibly her co-workers, in danger.[8]

[8] To the extent plaintiff argued that it was her exposure to a hostile work environment during the new-hire training classes that triggered her emotional dysregulation, the Court has found that the conduct and comments to which she was exposed were not sufficiently severe or pervasive enough to alter the conditions of employment or to create an abusive working environment.

**C. DISCRIMINATION**

The Court concludes that plaintiff's inability to perform the essential functions of her job, not her underlying disability, was the motivating factor behind Dr. Gonzalez' decision to seek an independent evaluation and to exclude plaintiff from the workplace until an evaluation showed that she had the coping skills to handle the normal stresses of employment as an aviation maintenance technician. Plaintiff has not shown that disability discrimination was a motivating factor in the employment decisions.

For all of the foregoing reasons, the Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

Dated this 29th day of February, 2016.

Robert S. Lasnik
United States District Judge